UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BISHOP PAIUTE TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>INYO COUNTY; WILLIAM LUTZE, Inyo County Sheriff; THOMAS HARDY, Inyo County District Attorney,<br><br>Defendants. | No. 1:15-cv-00367-DAD-JLT<br><br>ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS<br><br>(Doc. Nos. 45–47) |

This matter is before the court on defendants' motions to dismiss plaintiff's first amended complaint ("FAC"). (Doc. Nos. 45–47.) On October 17, 2017, those motions came before the court for hearing. Attorneys Dorothy Alther and Jasmine Andreas appeared on behalf of plaintiff Bishop Paiute Tribe (the "Tribe"), and attorney John Douglas Kirby appeared on behalf of defendants Inyo County (the "County"), Inyo County Sheriff William Lutze, and Inyo County District Attorney Thomas Hardy. Having reviewed the parties' briefing and heard oral arguments, for the reasons that follow, defendants' motions to dismiss will be denied.

## BACKGROUND

Plaintiff, a federally recognized Indian Tribe, seeks declaratory and injunctive relief in this action. (Doc. No. 12 (FAC) ¶ 1.) Plaintiff alleges as follows. On December 24, 2014, Officer Daniel Johnson, a duly authorized Tribal law enforcement officer, received an on-

1

Reservation call from a tribal member reporting a disturbance. (*Id.* ¶¶ 1, 21.) The tribal member reported that his non-Indian ex-wife was violating his tribal and state court issued protective orders by being at his home. (*Id.* ¶¶ 21, 23.) While en route to the tribal member's home, Officer Johnson notified the Inyo County Sheriff's Department of the tribal member's address and nature of the call. (*Id.*) Officer Johnson had prior experience with the suspect; during a nine-month period in 2014, tribal police had responded to eleven calls involving the suspect. (*Id.* ¶¶ 22, 23.) Officer Johnson, who arrived at the scene in a marked Tribal Police Patrol vehicle and wearing a tribal police uniform, approached the suspect in her vehicle and identified himself as "Tribal Police." (*Id.* ¶ 23.) After informing the suspect that she was not permitted to be at the tribal member's home by order of both the Tribal and state courts, the suspect became angry, verbally abusive, and insisted that she had a right to be at the home to visit her son. (*Id.*) Officer Johnson then informed the suspect that he was detaining her for actively violating the state court issued protective order and that she would also be cited for violating the tribal protective order, as well as for violations of tribal trespass and nuisance laws.[1] (*Id.*)

Officer Johnson's repeated orders to the suspect to exit her vehicle went unheeded. (*Id.* ¶ 24.) As Officer Johnson attempted to remove suspect from her vehicle, she began kicking at him, eventually making contact with his left inner thigh. (*Id.*) Officer Johnson then removed his Taser, placed it in "Drive Stun" mode, and warned the suspect that he would deploy his Taser if she refused to exit her vehicle. (*Id.*) When the suspect did not exit the vehicle, Officer Johnson deployed his Taser three times. (*Id.*)

Soon thereafter, an Inyo County's Sheriff's deputy arrived and encountered several family members who had gathered outside the home and were being verbally abusive towards Officer Johnson. (*Id.* ¶ 25.) After requesting that the family members return to their houses, the deputy sought assistance from the Bishop Police Department due to the hostility of the suspect and the

---

[1] The Tribe has established civil Tribal law and, as relevant here, has passed a nuisance ordinance, a trespass ordinance, and a Tribal public safety ordinance. (FAC ¶ 15.) The public safety ordinance authorizes the Tribal Court to issue and enforce "protective orders for the purposes of preventing violent or threatening acts, harassment, or sexual violence involving Tribal community members." (*Id.*)

family members who had gathered at the scene. (*Id.*) Officer Johnson was eventually successful in removing the suspect from her vehicle, after which he proceeded to handcuff her. (*Id.* ¶ 27.) The Inyo County Sheriff's deputy assisted by holding the suspect's right arm while Officer Johnson placed her in handcuffs. (*Id.*) Surrounding family members again began yelling at Officer Johnson and the deputy, in response to which the deputy deployed pepper spray at two onlookers, who retreated. (*Id.*) Officer Johnson then placed the suspect in his patrol car. (*Id.*)

An Inyo County Sheriff's Department Acting Lieutenant and a Bishop City Police Detective subsequently arrived at the scene. (*Id.* ¶ 28.) A records check was run and it was determined the suspect had an active restraining order against her, and was also on state court probation with terms and conditions which required that she not contact her tribal member ex-husband. (*Id.*) In conversations with the suspect's ex-husband, the sheriff's officers concluded that the ex-husband did not want his ex-wife arrested. (*Id.*) The suspect was informed that the matter would be referred to the Inyo County Probation Department, but that she would not be arrested at that time. (*Id.*) Officer Johnson cited the suspect with trespass, nuisance, and violating the tribal and state court issued protective orders. (*Id.*) Before leaving the scene, the deputy asked the suspect if she was injured. (*Id.* ¶ 29.) The suspect complained of injury to her abdominal area, and the deputy observed a slight redness on her stomach as well as a small abrasion on her left foot. (*Id.*) The suspect declined medical aid and was released. (*Id.*)

The following week, the Inyo County Sheriff's Department conducted an investigation into this incident and submitted their report to the Inyo County District Attorney's office. (*Id.* ¶ 30.) On January 5, 2015, a criminal complaint was filed by defendant Inyo County District Attorney Hardy in the Inyo County Superior Court, charging Officer Johnson with the following three felonies and one misdemeanor: (1) false imprisonment; (2) impersonating a public officer; (3) assault with a Stun-Gun; and (4) misdemeanor battery. (*Id.* ¶ 2, 30.)

On January 6, 2015, defendant Inyo County Sheriff Lutze sent a letter, characterized by plaintiff as a "Cease and Desist Order," to the Tribe ordering all Tribal Police to cease and desist all law enforcement of California statutes. (*Id.* ¶ 31.) Tribal Police were also ordered to refrain from possessing firearms outside of tribal property. (*Id.*) The letter accused tribal officers of

exercising "state police powers under the color of authority of Bishop Paiute tribal law" and emphasized that Tribal Police have no legal authority to enforce any state or federal laws on or off the reservation, and have only the rights of "private citizens." (*Id.*) The Tribe responded by assuring defendant Sheriff Lutze that its officers would not exercise state police authority, and would only carry their firearms off Reservation when coming to and from work, or when their patrol on the Reservation required them to cross State Highway 168 or travel on U.S. Highway 395. (*Id.*)

Plaintiff filed its original complaint in this court on March 6, 2015 and the FAC on March 30, 2015. (Doc. Nos 1, 12.) The defendants moved to dismiss. (Doc. Nos 13–16.) On July 13, 2015, the district judge previously assigned to this action *sua sponte* considered the court's jurisdiction, concluded that the allegations of the FAC failed to demonstrate a justiciable case or controversy and dismissed the action for lack of jurisdiction. (Doc. No. 35.) Plaintiff appealed and, on July 19, 2017, the Ninth Circuit Court of Appeals reversed and remanded the action. *See Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144 (9th Cir. 2017) (*Bishop Paiute II*). Specifically, the Ninth Circuit reversed the dismissal of the action on jurisdictional grounds, holding that: (1) the plaintiff tribe had alleged violations of federal common law and had therefore adequately pleaded a federal question providing the district court with subject matter jurisdiction under 28 U.S.C. § 1331; (2) the case was constitutionally and prudentially ripe because there was an actual and imminent threat to a concrete interest of the tribe; and (3) the case was not rendered moot by the tribe's letter issued in response to the Inyo County Sheriff's cease and desist letter. (*Id.*) Following the remand to this court, the action was reassigned to the undersigned. (Doc. No. 41.) Shortly thereafter, the pending motions to dismiss were filed.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to

4

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

**DISCUSSION**

In the FAC the plaintiff Tribe alleges that Officer Johnson's arrest and subsequent prosecution constitute a violation of federal common law. (FAC ¶ 42.) Plaintiff seeks two declaratory judgments. First, plaintiff seeks a judgment from this court stating that the defendants' actions in arresting and charging Officer Johnson, as well as the threat of future prosecution in state court via the "Cease and Desist Order," violate federal common law. (*Id.* ¶ 44.) Second, plaintiff seeks a declaratory judgment providing that the Tribe's police officers have the authority on its Reservation to "investigate violations of tribal, state, and federal law, detain, and transport or deliver a non-Indian violator to the proper authorities." (*Id.* ¶ 45.) Finally, plaintiff seeks an injunction preventing defendants from arresting and criminally prosecuting the Tribe's duly authorized police officers for carrying out their official duties. (*Id.* ¶ 46.)

Below, the court addresses each of the arguments advanced by defendants in support of their motions to dismiss.

**A.     Failure to State a Claim**

Defendants collectively assert that plaintiff fails to state a plausible claim upon which relief may be granted. The crux of defendants' argument is that the Bishop Paiute Tribe—and by extension Officer Johnson—has no authority to enforce state law unless the state affirmatively grants the Tribe such authority. In addition to citing the suspect in this incident with trespass, nuisance, and violation of a tribal protective order, Johnson also cited the suspect with violating the state court issued protective order. (*Id.* ¶ 28). Defendant Sheriff Lutze argues—and plaintiff

does not appear to dispute—that under California Penal Code § 830.1, Officer Johnson is not a "peace officer," and therefore has no more statutory authority to enforce California law than any other citizen. (Doc. 46-1 at 6–7.) Therefore, if Officer Johnson had the authority to enforce the state protective order against the suspect in this instance, that authority derives from the inherent authority of the Tribe rather than from statute. The question of whether or not a Tribe has the inherent authority to enforce state law on tribal land is therefore before the court.

The Ninth Circuit has already rejected the notion that this court lacks subject matter jurisdiction to hear this action. *See Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144 (9th Cir. 2017) (*Bishop Paiute II*). Although the appellate court found that it was not necessary to reach the merits of plaintiff's claim, in its opinion reversing the dismissal of the action and remanding to this court the panel did observe that "the Tribe has at least a colorable claim for relief." *Id.* at 1152 n.3 (citing *Duro*, 495 U.S. at 697 and *Ortiz–Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975)). With this background in mind, the court turns to the merits of defendants' failure to state a claim argument.

As a general rule, "[t]ribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them." *Duro v. Reina*, 495 U.S. 676, 697 (1990), *superseded by statute on other grounds*, Pub. L. 101–511, 104 Stat. 1856, *as recognized in United States v. Lara*, 541 U.S. 193, 194 (2004). Thus, "[w]here jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.*

In determining the extent of that power, the court finds the Ninth Circuit's decision in *Ortiz-Barraza* to be instructive because it involved facts quite similar to those in this case. There, a tribal police officer effectuated a traffic stop on a vehicle he suspected of trespassing, in violation of tribal law. *Ortiz-Barraza*, 512 F.2d at 1179. During the course of the traffic stop, the tribal officer came to believe that he had discovered an alien who had entered the country and was either transporting illegal aliens or controlled substances—and had therefore committed crimes in violation of state and federal law. *Id.* Based on this belief, the tribal officer searched the vehicle and discovered burlap sacks containing marijuana. *Id.* The suspect was then taken by the tribal

6

officer to the tribal detention facility and held for transfer to the custody of the federal Drug Enforcement Administration. *Id.*

Just as in the present case, the officer in *Ortiz-Barraza* lacked any statutory authority to investigate violations of either state or federal law.[2] *Id.* The question before the Ninth Circuit in that case was whether, despite this lack of statutory authority, the tribal officer had the inherent authority to investigate violations of state and federal law, and to detain those individuals before delivering them to the appropriate state or federal authorities. Citing authority dating back almost two hundred years, the Ninth Circuit concluded that tribal authorities have the "sovereign power . . . to exclude trespassers who have violated state or federal law by delivering the offenders to the appropriate authorities." *Id.* at 1179 (citing *Ex parte Kenyon,* 14 F. Cas. 353 (C.C.W.D. Ark. 1878); Dep't of the Interior, Office of the Solicitor, Federal Indian Law 438, 439 (1958); 1 Op. Att'y Gen. 465 (1821); F. Cohen, Handbook of Federal Indian Law 306 (1942 ed. as republished by the University of New Mexico Press)). The Ninth Circuit also concluded that this power would be rendered meaningless if the tribe was not also authorized to investigate such violations of state and federal law. *Id.* at 1180 (citing *Settler v. Lameer*, 507 F.2d 231, 238 (9th Cir. 1974) (noting that "[t]he power to regulate is only meaningful when combined with the power to enforce")). Because tribal authorities have the power to exclude from the reservation those who violate state or federal law, they necessarily also possess the power to investigate whether those laws have been violated. *Bressi v. Ford*, 575 F.3d 891, 895 (9th Cir. 2009) (citing *Ortiz-Barraza*, 512 F.2d at 180 and *State v. Schmuck*, 850 P.2d 1332 (Wash. 1993)); *United States v. Terry*, 400 F.3d 575, 579–80 (8th Cir. 2005). Accordingly, upon a determination that a violation of state or federal law has occurred, tribal authorities "may detain the violators in order to deliver them to state or federal authorities." *Bressi*, 575 F.3d at 895 (citations omitted).

---

[2] Notably, in *Ortiz-Barraza* the tribal council had adopted a law authorizing tribal police officers to eject individuals from the reservation if they committed an act which would be a federal or state offense, or to turn the offender over to state or federal law enforcement. *Id.* at 1180. Similarly in this case, Section 202 of the Tribal Public Safety Ordinance No. 2009-01 gives "full faith and credit" to protective orders issued by a state court. (Doc. 12-1 at 24.) Defendants do not challenge plaintiff's contention that this provision gives tribal authorities the power to enforce state court issued protective orders.

7

The same logic applies in this case. Officer Johnson was responding to a potential violation of a state protective order. (FAC ¶ 23.) Upon arriving at the scene, he informed the suspect that he intended to detain her for actively violating the state court issued protective order. (*Id.* ¶ 23.) Plaintiff alleges that tribal law provided Officer Johnson with the authority to enforce that state protective order. (*See id.* ¶ 15.) Johnson, by virtue of his status as a duly sworn officer of the Bishop Paiute Tribe, possessed the inherent authority to detain the suspect in the course of investigating whether she had violated the state court issued protective order.

Defendants attempt to distinguish *Ortiz-Barraza* on the grounds that there the tribal officer was investigating a violation of tribal law, rather than state law. (Doc No. 46-1 at 10.) The argument is not persuasive. It is true that the initial traffic stop in *Ortiz-Barraza* was carried out so that the tribal officer could "ascertain to whom the vehicle belonged," and to determine whether the individual was trespassing on tribal land. *Ortiz-Barraza*, 512 F.2d at 1178. Upon doing so, however, the circumstances of the traffic stop gave the tribal officer cause to suspect that the driver was engaged in either drug smuggling or human trafficking in violation of state and federal law. *Id.* at 1179. It was only then, in the course of investigating whether *those* crimes had been committed, that the tribal officer conducted a search of the driver's vehicle and discovered the contraband. *Id.* In its analysis the Ninth Circuit made clear that it was addressing the question of whether the tribal officer had the authority to investigate the possible commission of those federal and state offenses. *Id.* at 1180 ("We find that the actions of the Papago Council, taken together with the Papago Constitution and the applicable law previously discussed, clearly establish the authority of a tribal police officer, like Officer Antone, to investigate any on-reservation violations of state and federal law."). Defendants' contention that *Ortiz-Barraza* was limited to the question of enforcement of tribal law therefore lacks merit.

Alternatively, defendants contend that Officer Johnson's actions were improper because Congress has not affirmatively authorized Indian tribes to investigate violations of state law. (Doc. 46-1 at 12.) The court finds this argument unpersuasive as well. As discussed above, it is well-established that tribes are "unique aggregations possessing attributes of sovereignty," and that that sovereignty is inherent in the tribe's existence rather than solely a creature of statute.

8

*Nevada v. Hicks*, 533 U.S. 353, 389 (2001) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140–41 (1982)); *see also Lara*, 541 U.S. at 198 (recognizing that tribes possess their "own inherent *tribal* authority, not delegated *federal* authority"). No affirmative grant of state or federal authority to the Tribe is required in the present context. In none of the cases cited above did the courts require an affirmative delegation of power upon which to base their finding that the tribes possessed the authority to investigate violations of state or federal crimes. *Bressi*, 575 F.3d at 895; *Terry*, 400 F.3d at 579–80; *Ortiz-Barraza*, 512 F.2d at 1180; *Schmuck*, 850 P.2d at 1341 ("We also note that the Tribe's authority to stop and detain is not necessarily based *exclusively* on the power to exclude non-Indians from tribal lands, but may also be derived from the Tribe's general authority as sovereign.") (citation omitted). While there are certainly contexts in which a tribe's authority must be delegated by Congress if it is to exist at all,[3] defendants have presented no authority for the proposition that this is such a context.

        Defendants caution that if the court recognizes a tribe's inherent authority to investigate violations of state law, "persons who are victims of this new-found power of tribes and tribal officers will have no recourse against offending tribal-officers, or their tribal-employers, for wrongs committed by them, due to tribal sovereignty." (Doc. 46-1 at 6.) Without citation to legal authority, defendants contend that tribal sovereign immunity would provide officers such as Officer Johnson with absolute immunity from suits pursuant to 42 U.S.C. § 1983 or *Bivens*. (*Id.*) Such concerns are unwarranted. Tribal sovereign immunity for tribal officers is no broader than the sovereign immunity protections enjoyed by state and federal officers. *Maxwell v. County of San Diego*, 708 F.3d 1075, 1089 (9th Cir. 2013) ("We see no reason to give tribal officers broader sovereign immunity protections than state or federal officers given that tribal sovereign immunity is coextensive with other common law immunity principles.") (citation omitted). Although sovereign immunity extends to tribal officials when acting in their official capacity and within the

---

[3] Defendants correctly point out that, in other areas of the law, congressional delegation of power is required before a tribe may act. In the specific context of criminal prosecution, for instance, tribes lack the inherent authority to criminally prosecute non-Indians under tribal law. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212 (1978). Here, however, Officer Johnson was not investigating any violations of tribal criminal law; the tribe itself does not even have a criminal code to speak of. (FAC ¶ 15.) *Oliphant* is therefore inapposite.

scope of their authority, "tribal defendants sued in their *individual* capacities for money damages are not entitled to sovereign immunity." *Pistor v. Garcia*, 791 F.3d 1104, 1112 (9th Cir. 2015) (citing *Maxwell*, 708 F.3d at 1089 and *Miller v. Wright*, 705 F.3d 919, 928 (9th Cir. 2013)). Denial of defendants' motion to dismiss will in no way undermine the ability of individuals to bring civil rights actions seeking redress against tribal police officers, just as they could against federal and state law enforcement officers.

For all of these reasons, defendants' motions to dismiss for failure to state a claim will be denied.

**B.     *Respondeat Superior***

Defendant Inyo County separately moves to dismiss on the grounds that "no claim is made in the amended complaint that invokes *respondeat superior* liability." (Doc. 45-1 at 7.) Plaintiff has brought its claims against the defendant County on the ground that "the County is responsible for the actions of the Sheriff." (Doc. No. 49 at 6.) The defendant County disagrees, arguing that because "it is the Sheriff who establishes final policy for the County in the conduct of law enforcement policy," the County may not be held liable. (Doc. No. 50 at 4).

Counsel for defendant Inyo County has cited no legal authority in support of this argument in the moving papers. In its reply brief, however, the defendant County relies on the Ninth Circuit's decision in *Brewster v. Shasta County*, 275 F.3d 803 (9th Cir. 2001), a case in which the court addressed the question of whether in California a county sheriff acts on behalf of the county or the state when investigating crimes for purposes of liability under 42 U.S.C. § 1983.[4] After analyzing applicable California law, the Ninth Circuit concluded that when

---

[4] Municipal liability under § 1983 is governed by *Monell v. Dep't of Soc. Servs. of City of New York*, which held that a local government may not be sued under § 1983 for an injury inflicted by its employees or agents unless the injury was inflicted pursuant to a "government's policy or custom." 436 U.S. 658, 694 (1978). *Monell* was a "statutory decision" interpreting the legislative intent behind § 1983, and in which the Supreme Court concluded that Congress intended to limit the circumstances under which municipalities would be held liable for the actions of their employees under that statute. *Id.* at 700; *see also Owen v. City of Independence*, 445 U.S. 622, 635 (1980) (noting that "the question of the scope of a municipality's immunity from liability under § 1983 is essentially one of statutory construction"). As such, the "policy or custom" requirement does not necessarily apply outside the context of § 1983 actions. *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989) (considering whether *Monell* applies to

investigating criminal violations, "California sheriffs are county actors." *Id.* at 811. As such, the Ninth Circuit held that Shasta County in that case was subject to liability under § 1983 for the actions of its sheriff. *Id.* at 812.

This court is puzzled by the defendant County's reliance on the decision in *Brewster* in support of the motion to dismiss the claims brought against it here. At best, *Brewster* is simply inapposite since it involved alleged liability under § 1983 rather than a claim of *respondeat superior* liability in an action brought under federal common law such as presented in this case. At worst, the decision in *Brewster* is effectively fatal to the County's motion to dismiss since the plaintiff there was allowed to maintain suit against the county on the basis of the investigative law enforcement actions of the county's sheriff—precisely what plaintiff seeks to do here.

As the Supreme Court has noted, the decision in *Monell* operated as a "constraint[ ]" on the doctrine of *respondeat superior*. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 712 (1989); *see also Monell*, 436 U.S. at 707 (examining the legislative history of § 1983 and interpreting the rejection of an amendment to the law as "a rejection of *respondeat superior* or any other principle of vicarious liability."). It therefore follows that outside the context of § 1983, absent other authority, *respondeat superior* liability exists. *See Estate of Alvarez v. John Hopkins University*, ___F. Supp. 3d ___, Civil Action No. MJG-15-950, 2017 WL 4174967, at *12-14 (D. Md. Aug. 30, 2017) (discussing possible application of *respondeat superior* liability under the common law in the context of a claim brought under the Alien Tort Statute). This is so because the doctrine of *respondeat superior* is not a creature of statute, but rather a presumption arising from the common law. *See, e.g.*, *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 217

---

an action brought under 42 U.S.C. § 1981). It is therefore not apparent whether *Monell* and its progeny apply to actions brought under federal common law such as this one. The defendant County has offered no argument or authority on this point. Moreover, every case cited by the defendant County analyzes claims brought under § 1983. (*See* Doc. No. 50 at 2–3) (citing *Bishop Paiute Tribe v. County of Inyo*, 291 F.3d 549 (9th Cir. 2002), *vacated sub nom. Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701 (2003) (*Bishop Paiute I*) (considering whether the Tribe had standing under § 1983 to bring suit against the County); *McMillian v. Monroe County*, 520 U.S. 781 (1997) (considering whether the county sheriff represented the state or the county for purposes of § 1983 liability); *Brewster v. County of Shasta*, 112 F. Supp. 2d 1185 (E.D. Cal. 2000), *aff'd*, 275 F.3d 803 (9th Cir. 2001) (same)).)

11

(1979); *see also Lee v. City of Philadelphia*, Civil Action No 08-CV-862, 2008 WL 2697320, at *3, n. 10 (E.D. Pa. July 3, 2088) ("*Respondeat superior* is a firmly established doctrine of federal common law applicable to a wide field of anti-discriminatory statutes. [citations omitted.] The *Monell* doctrine under 42 U.S.C. § 1983 is an exception to the rule.") A statute may certainly supplant the doctrine and impose a new standard for vicarious liability, as *Monell* itself did. 436 U.S. at 694; *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576 (9th Cir. 1990) (considering whether § 20(a) of the Securities Act of 1934 replaced the common law doctrine of *respondeat superior* in the context of securities actions). Absent such replacement, however, there is no reason why *respondeat superior* liability does not apply here.

Accordingly, defendant Inyo County's motion to dismiss on the basis that "no claim is made in the amended complaint that invokes *respondeat superior* liability" will be denied.

## C. Prosecutorial Discretion

Defendant Inyo County District Attorney Hardy argues that plaintiff's claims against him must be dismissed on the ground that, in the exercise of his prosecutorial discretion, he reasonably believed that Johnson's use of force against the suspect was unlawful. (Doc. No. 47-1 at 16.) In moving to dismiss, defendant Hardy relies on the decision in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc) in which the Ninth Circuit found that in the § 1983 actions before it the use of tasers by law enforcement officers constituted constitutionally excessive force but that the officers were entitled to qualified immunity because their conduct did not violate clearly established law. Once again, the court has difficulty deciphering this argument advanced in support of dismissal of plaintiff's FAC. It may be that, as in *Mattos*, Officer Johnson's actions constituted the excessive use of force, actionable under 42 U.S.C. § 1983.[5] However, that is irrelevant to resolution of the motion to dismiss pending before this court.

The only question before the court is whether defendant Hardy may be held liable for the wrongs alleged by plaintiff in the FAC. **D**efendant Hardy cites no authority for the proposition

---
[5] Defendants again rely solely on decisions rendered in the context of actions brought under § 1983 cases without explaining the application of those decisions to this action which has been brought under federal common law.

12

that a plaintiff may not seek to enjoin a prosecutor from future unlawful actions simply because those actions are prosecutorial decisions made in the course of his official duties. This is not surprising. When acting in an enforcement capacity, prosecutors are not immune from suits seeking injunctive or declaratory relief. *See Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980) (noting that "prosecutors enjoy absolute immunity from damages liability, but they are natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law."); *Wilson v. Stocker*, 819 F.2d 943, 950 (10th Cir. 1987) (rejecting a District Attorney's invocation of prosecutorial immunity on the grounds that under the *Consumers Union* decision, they are subject to suits for injunctive relief); *Tarter v. Hury*, 646 F.2d 1010 1012 (5th Cir. 1981) (concluding that prosecutors do not enjoy absolute immunity as to claims for declaratory and injunctive relief). Accordingly, defendant Hardy's motion to dismiss will be denied.

**D.     Eleventh Amendment**

Finally, defendant District Attorney Hardy seeks his dismissal from this action on the ground that he is immune from suit under the Eleventh Amendment. Generally, the Eleventh Amendment bars the federal courts from entertaining suits brought by a private party against a state or its officials. *See Flint v. Dennison*, 488 F.3d 816, 824–25 (9th Cir. 2007) (Eleventh Amendment bars damages actions against state officials in their official capacity); *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). "However, the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *L.A. Cty. Bar Ass'n,* 979 F.2d at 704 (citing *Ex Parte Young*, 209 U.S. 123, 155–56 (1908)). Defendant asserts, and plaintiff concedes, that a district attorney carrying out his or her prosecutorial functions, as opposed to investigative functions, acts as a state official, rather than a county official. *Bishop Paiute I*, 291 F.3d at 564–65.[6]

---

[6] Were the claim against Sheriff Hardy to involve his actions undertaken as part of his investigatory function, he would be a county actor and not be entitled to the protections of the Eleventh Amendment. *Eason v. Clark Cty. Sch. Dist.*, 303 F.3d 1137, 1141 (9th Cir. 2002) (citing *Lincoln County v. Luning*, 133 U.S. 529 (1890)) (reciting the familiar rule that "the Eleventh Amendment does not extend to counties and municipal corporations."); *see also Jackson v. Barnes*, 749 F.3d 756, 764–66 (9th Cir. 2014).

Although plaintiff here seeks only injunctive and declaratory relief, defendant Hardy contends that the Eleventh Amendment nonetheless immunizes him from suit because the *Ex Parte Young* doctrine applies only to "ongoing and continuous" violations of federal law. (Doc. No. 51 at 4.)

Where a plaintiff seeks prospective injunctive relief, the Eleventh Amendment does not bar suit. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) ("Conversely, the Court held that the suit was proper to the extent it sought 'payment of state funds . . . as a necessary consequence of compliance in the future with a substantive federal-question determination . . ..'") (quoting *Edelman v. Jordan*, 415 U.S. 651, 663–68 (1974)); *Arizona Students' Association v. Arizona Board of Regents,* 824 F.3d 858, 865 (9th Cir. 2016) ("Although sovereign immunity bars money damages and other retrospective relief against a state or instrumentality of a state, it does not bar claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law."); *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1169 (9th Cir. 2015) (In *Edelman* the Supreme Court "held only prospective, non-monetary relief against state officials is exempt from the Eleventh Amendment bar."); *see also Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1155 (10th Cir. 2011) (holding that the doctrine of *Ex Parte Young* applies to actions brought pursuant to federal common law in the tribal context). By contrast, where a plaintiff seeks only to remedy a past violation of the law, the Eleventh Amendment bars the action. *See Green v. Mansour*, 474 U.S. 64, 67-69 (1985) (distinguishing claims for prospective and retrospective relief and explaining that claims for retrospective relief are barred by the Eleventh Amendment); *Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002).

To determine whether the Eleventh Amendment bars the suit, courts must conduct a two-pronged, "straightforward inquiry." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (dividing the inquiry from *Verizon* into two distinct prongs); *see also North East Medical Services, Inc. v. California Dep't. of Health Care Services*,

712 F.3d 461, 470–71 (9th Cir. 2013). First, the court asks "whether [the] complaint alleges an ongoing violation of federal law." *Verizon*, 535 U.S. at 635 (citations omitted). Second, the court must examine whether the relief sought by plaintiff can be "properly characterized as prospective." *Id.*

The court first addresses whether plaintiff alleges an ongoing violation of federal law in this action. On its face, plaintiff's FAC alleges both past *and* future violations: it alleges that defendants violated the law in the past by prosecuting Officer Johnson, but it also alleges that the threat of future prosecution of tribal officers violates federal common law. (FAC ¶ 44.) The fact that a plaintiff seeks both prospective and retrospective relief does not, by itself, defeat the application of the *Ex Parte Young* doctrine. *See Verizon*, 535 U.S. at 646 (permitting the plaintiff to proceed with his claims even where plaintiff "seeks a declaration of the *past*, as well as the *future*," violations of law, so long as the violation is ongoing). As discussed above, tribal authorities have the inherent sovereign authority to exclude from the reservation those who violate state or federal law under federal common law and, therefore, the authority to investigate violations of state law that occur on tribal land and to detain potential violators of such laws in order to deliver them to the proper authorities. *See Bressi*, 575 F.3d at 895; *Terry*, 400 F.3d at 579–80. In the Cease and Desist Order sent to the Tribe, defendant Inyo County Sheriff Lutze explicitly warned that "Tribal Police employees will be subjected to arrest and criminal prosecution" in the event they exercise that right.[7] (Doc. No. 12-1 at 8.) By requesting an injunction, plaintiff seeks to address and remove this threat of future arrest and criminal

---

[7] Defendant Hardy, as the Inyo County District Attorney, would be the official responsible for carrying out such criminal prosecutions. Defendant Hardy attempts to avoid this connection between the Inyo County Sheriff's Department and himself by arguing that "no threat has been made *by Mr. Hardy* that he will violate federal law in the future." (Doc. No. 51 at 4) (emphasis added). In other words, he suggests that because he has made no explicit statement of an intent to prosecute Tribal officers in future, there is no case or controversy sufficient to create Article III standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (internal quotation marks and citations omitted) ("To establish Article III standing, an injury must be concrete, particularized, and actual or imminent."). However, the Ninth Circuit has already rejected this argument in this very case. *Bishop Paiute II*, 863 F.3d 1144, 1154 (finding that the threat to the Tribe's interest is "actual and imminent" owing to "the arrest and prosecution of Johnson and the cease and desist order threatening future prosecutions.").

prosecution. (*See* FAC ¶ 43) ("Defendants' threat of future arrests and charging of the Tribe's officers for carrying out their lawful and duly authorized power, is a direct, and immediate interference, with the Tribe's sovereign authority."). Therefore, this is not a case in which the alleged injury "is a one-time, past event." *See S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 510 (6th Cir. 2008) (barring suit because "the Plaintiffs do not seek a prospective injunction that requires the Attorney General to conform his conduct in an ongoing, continuous fashion.") In short, here the plaintiff Tribe seeks an order "that state officials be restrained from enforcing an order in contravention of controlling federal law." *Verizon*, 535 U.S. at 645. The court therefore finds that the complaint alleges an ongoing violation of federal law by defendant Hardy, satisfying the first prong of the inquiry under *Verizon*.

Next, if the relief sought by plaintiff can be properly characterized as prospective, the action may proceed against defendant Hardy. *Id.* However, if the relief sought is "tantamount to an award of damages for a past violation of federal law," the Eleventh Amendment would bar the action. *Papasan v. Allain*, 478 U.S. 265, 278 (1986). The determination of whether equitable relief is "tantamount" to an award of damages is often not clear-cut. Indeed, the Supreme Court has recognized that "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex Parte Young* will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667.

On the face of the FAC, plaintiff seeks solely equitable relief and not damages. (FAC ¶¶ 44–46) (praying only for declaratory and injunctive relief). Moreover, examining the substance of plaintiff's claim, the court cannot find that the granting of the requested injunctive relief against defendant District Attorney Hardy would expose the county to monetary liability. Indeed, defendant Hardy has advanced no argument to the contrary. Therefore, this is not a case where the granting of the injunctive relief sought would "lead inexorably to the payment of state funds." *Quern v. Jordan*, 440 U.S. 332, 347 (1979) (requiring an unbroken "chain of causation" between the granting of injunctive relief and the award of monetary damages in order for the Eleventh Amendment to bar suit); *Edelman*, 415 U.S. at 668 (declining to grant the injunctive relief sought by plaintiff because it "requires payment of state funds"); *see also Ernst v. Rising*, 427 F.3d 351,

371 (6th Cir. 2005) (declining to issue an injunction after determining that doing so would "compel other transfers of state funds" to remedy the past violation of law). Therefore, defendant Hardy is not entitled to dismissal of the claims brought against him based upon Eleventh Amendment immunity.

**CONCLUSION**

For all of the reasons set forth above, defendants' motions to dismiss plaintiff's first amended complaint (Doc. Nos. 45–47) are denied in their entirety.

IT IS SO ORDERED.

Dated: **January 10, 2018**

UNITED STATES DISTRICT JUDGE